## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| B.E. TECHNOLOGY, L.L.C.,<br><br>              Plaintiff,<br><br>    v.<br><br>GOOGLE LLC,<br><br>              Defendant. | C.A. No. 20-622-LPS<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff B.E. Technology, L.L.C. ("B.E.") hereby asserts the following claims for patent infringement of United States Patent Nos. 8,549,410 (the "'410 Patent"), 8,549,411 (the "'411 Patent"), and 8,769,440 (the "'440 Patent" and together with the '410 Patent and '411 Patent, the "Patents-in-Suit") against Defendant Google LLC ("Google"), and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, seeking damages and other relief under 35 U.S.C. § 281, *et seq.*

## PARTIES

2.      B.E. is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Canton, Georgia.

3.      On information and belief, Google is a corporation organized and existing under the laws of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google may be served with process through its registered agent, the Corporation Services Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action concerns the infringement of U.S. patents.

6.      On information and belief, Google is subject to this Court's specific and general personal jurisdiction because it conducts substantial business in the District of Delaware, directly and/or through intermediaries, including: (i) committing at least a portion of the acts of infringement alleged herein in this District, and (ii) regularly conducting or soliciting business in this District, engaging in other persistent courses of conduct in this District including maintaining continuous and systematic contacts in this District, availing itself of the privileges of doing business in this District.

7.      Venue is proper in this District under 28 U.S.C. § 1400(b) because Google is a Delaware corporation and therefore resides in this District.

## BACKGROUND

8.      In 1995, David Hoyle, a computer programmer in New Orleans, recognized that people used computers at both work and home and that their inability to access their information regardless of which computer they were using was a problem—how could people access their information without being forced to return to the specific hardware they used?

9.      Mr. Hoyle realized that no one was addressing this problem.  In the mid-1990s, the industry was primarily concerned with solving the network issue of providing faster Internet access in homes.  Mr. Hoyle decided to create a way for people to access their information online independent of the device they were using.

10.     To capitalize on his ideas, Mr. Hoyle formed B.E. in August 1997.  He developed a system that allowed computer users to retrieve information from any computer.  This solution included software that provided a toolbar interface that could be utilized on the desktop of both a home computer and a work computer and that would enable a user to access all their files.

11.     Mr. Hoyle further developed personalized products and services that delivered digital networking technologies for users and enabled users to connect to a ubiquitous network. These developments pre-dated cloud-based computing by 10 years.  This development further allowed users to connect to a broad range of electronic devices and software including computers, printers, disk drives, phones, cameras, appliances, software and services in a universal network.

12.     Mr. Hoyle wanted to provide his products free of charge through online real-time reactive advertising.  As discussed below (*see infra* ¶¶ 27–34), a real-time reactive advertising system selects advertisements in reaction to a computer user's activities and provides an advertisement to be displayed in response thereto.  At the time of his invention, Mr. Hoyle recognized that online real-time reactive advertising could not be implemented with conventional computer systems because such conventional systems did not and could not gather and distribute information regarding an individual's computer usage.  Recognizing this problem, Mr. Hoyle was ultimately able to leverage his software developments to solve this technical challenge in a novel way.

13.     Online advertising began in 1994 with text-based or animated banner ads.  At that time, advertisers paid for pages viewed.  Using this conventional system, advertisers could not deliver real time advertising based on particular information specific to the user.

14.    Targeted advertising is a form of advertising directed towards audiences with certain characteristics.  It could be based on a product's characteristics or a person's characteristics including a person's previous or current buying history or behavior.

15.    Mr. Hoyle sought to create a real-time, reactive network-based targeted advertising system based on two-things: (1) information previously learned about a user; and (2) information concerning what a user is doing in real time.  For ease of reference, and as explained below in more detail, (*see infra* ¶¶ 27–34), a system providing advertisements based on these two-things is referred to herein as a "two-tiered" advertising system.

16.    To achieve a two-tiered real-time reactive advertising system, Mr. Hoyle leveraged the ubiquitous network technology he developed which permitted the gathering of user information from any computer.  For example, Mr. Hoyle determined that information related to keywords on a web-page visited by a user could be compared with keywords stored on a server (and associated with advertisements) and act as a proxy for determining what a user is doing in real time.  Mr. Hoyle further determined that providing software with the ability to track a user's activities and associating those activities with a user would permit a network to provide two-tiered network-based advertisements.  Mr. Hoyle recognized that these implementation details, which were based on his knowledge and experience, were not conventional in the late 1990s and allowed for the providing of responsive real-time advertising.

17.    Mr. Hoyle recognized that his implementation details were not only unconventional but the technology he created improved upon and overcame technical limitations with conventional computer systems which could not provide real-time, reactive advertisements.  As detailed below, these technical problems included problems associated with conventional browsers, scripting languages, computer processing speeds and download speeds.  Mr. Hoyle's

system allowed for advertisements to be inserted at the right moment to display the right ad for the right user—*e.g.*, a woman in Denver with a history of purchasing luxury items viewing a webpage about cars could be provided advertisements associated for a Mercedes-Benz.  Mr. Hoyle designed technology that enabled electronic devices to provide advertisements based on information previously unknown about a computer user, *e.g.*, what a user is doing in real-time, and information previously known about a user, *e.g.,* information collected regarding the user's characteristics.

18.     Mr. Hoyle filed for patent protection in July 1998 and was eventually granted 10 patents covering his technologies.

19.     Today the two largest sectors of online targeted advertising are display/video ads and search ads.  Google has a massive share of both sectors.  Google did not start using AdWords, its two-tiered, real-time insertion of targeted advertising with user profiles based upon usage (clickthrough), until 2002.  Google's infringement of Mr. Hoyle's patents paved the way for Google to generate billions of dollars in revenue.

## PATENTS-IN-SUIT

### Background

20.     Mr. Hoyle is the inventor of the '410 Patent, entitled "Method of Reactive Targeted Advertising," which the U.S. Patent & Trademark Office duly issued on October 1, 2013.  B.E. is the owner by assignment of the '410 Patent.  It is valid and enforceable, and was duly issued in full compliance with the Patent Laws of the United States, Title 35 of the United States Code.  A true and correct copy of the '410 Patent is attached hereto as Exhibit 1.

21.     Mr. Hoyle is the inventor of the '411 Patent, entitled "Method of Reactive Targeted Advertising," which the U.S. Patent & Trademark Office duly issued on October 1, 2013.  B.E. is the owner by assignment of the '411 Patent.  It is valid and enforceable, and was duly issued in

full compliance with the Patent Laws of the United States, Title 35 of the United States Code.  A

true and correct copy of the '411 Patent is attached hereto as Exhibit 2.

22.     Mr. Hoyle is the inventor of the '440 Patent, entitled "Method of Reactive Targeted

Advertising," which the U.S. Patent & Trademark Office duly issued on July 1, 2014.  B.E. is the

owner by assignment of the '440 Patent.  It is valid and enforceable, and was duly issued in full

compliance with the Patent Laws of the United States, Title 35 of the United States Code.  A true

and correct copy of the '440 Patent is attached hereto as Exhibit 3.

23.     The Patents-in-Suit describe and claim a particular way of providing responsive

advertising to a user.  For example, claim 1 of the '410 Patent recites:

> A method comprising permitting a computer user to access one or more servers via a
> network; transferring a copy of software to a computer associated with the computer user,
> the software being configured to run on the computer to display advertising content and
> record computer usage information associated with utilization of the computer, wherein
> the computer usage information includes data regarding one or more programs run on the
> computer; determining a unique identifier associated with the computer, wherein the
> identifier uniquely identifies information sent from the computer to the one or more
> servers; determining that one or more keywords of a plurality of keywords are associated
> with a displayed webpage with the plurality of keywords being stored in a memory
> associated with the one or more servers; selecting an advertisement to be displayed on the
> computer, the selection based at least on the one or more keywords together with
> information associated with the unique identifier identifying the computer, receiving a
> request for an advertisement from the computer accessing the web page; and providing the
> selected advertisement for display on the computer in response to the received request.

24.     Claim 1 of the '411 Patent recites:

> A method comprising permitting a computer user to access one or more servers via a
> network; transferring a copy of software to a computer associated with the computer user,
> the software being configured to run on the computer to display advertising content and
> record computer usage information associated with utilization of the computer, the
> software being configured to allow user messaging capabilities between the user and one
> or more users, wherein when the program runs on the computer such that one of a number
> of unique identifiers is recorded by the software; determining a unique identifier associated
> with the computer, wherein the identifier uniquely identifies information sent from the
> computer to the one or more servers; determining the computer usage of the computer;
> retrieving information from a user demographic database associated with the computer
> user; storing the retrieved information in memory associated with one or more servers;

6

associating the retrieved information with the user; selecting an advertisement to be displayed on the computer, the selection based at least on the usage of the computer together with information associated with the unique identifier identifying the computer, receiving a request for an advertisement from the computer accessing the web page; and providing the selected advertisement for display on the computer in response to the received request.

25.     Claim 1 of the '440 Patent recites:

A method comprising permitting a computer user to access one or more servers via a network; transferring a copy of software to a computer associated with the computer user, the software being configured to run on the computer to display advertising content and record computer usage information associated with utilization of the computer, wherein the computer usage information includes data regarding one or more programs run on the computer; determining a unique identifier associated with the computer, wherein the identifier uniquely identifies information sent from the computer to the one or more servers; selecting an advertisement to be displayed on the computer, the selection based at least on information associated with the unique identifier identifying the computer; receiving a request for an advertisement from the computer; and providing the selected advertisement for display on the computer in response to the request.

**A Person of Ordinary Skill in the Art at the Relevant Time**

26.     A person of ordinary skill in the art of the claimed inventions of the Patents-in-Suit would have had at least a bachelor's degree in computer science (or a related field) and two years of work experience with networking (including the World Wide Web), server-side programming languages, databases, networking, and client/server architecture at the time of the claimed inventions, July 1998.  This minimum required level of ordinary skill in the art is supported by the background of the specification, which explains the technological background for the inventions in relation to networking systems and drawbacks with certain known systems.  (*See infra* ¶¶ 35–38; Ex. 4, Zatkovich Decl. ¶¶ 15–35.)[1]  The detailed description of the inventions and the

---

[1] The Declaration of Ivan Zatkovich in Support of B.E. Technology, L.L.C.'s Answering Brief in Opposition to Twitter, Inc.'s and Google LLC's Joint Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(B)(6) ("Zatkovich Decl.") is attached hereto as Exhibit 4 and is incorporated by reference herein.  Certain opinions in the Zatkovich Declaration are cited herein as exemplary support for statements regarding the understanding of one of ordinary skill in the art.  Those citations and opinions should not be understood to be the universe of opinions and

associated Figures similarly evidence that a least a computer science degree and work experience in the field of computer science is necessary to understand and implement the claimed inventions. (*See infra* ¶¶ 35–38; Ex. 4, Zatkovich Decl. ¶¶ 28–43 (discussing specification in detail).)

### The Claims Are Not Directed to Abstract Ideas

27.     One of ordinary skill in the art would understand the claims of the Patents-in-Suit are directed, at a high level, to network based two-tiered targeting advertising methods.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 15–17, 44.)  As detailed below (*see infra* ¶¶ 28–34), the claims of the Patents-in-Suit would be understood by a person of ordinary skill in the art to be directed to specific implementations of network based two-tiered targeting advertising methods.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 15–17, 44.)

28.     One of ordinary skill in the art would recognize that the claims of the Patents-in-Suit are directed to a specific type of reactive, real-time network-based advertising using two tiers. As detailed above, Mr. Hoyle created a reactive, real-time network-based targeted advertising system based on two different types of information about a user: (1) information previously learned about a user, *e.g.*, demographic information; and (2) information concerning what a user is doing in real time.  Consistent with Mr. Hoyle's above-described discoveries, claim 1 of each of the Patents-in-Suit are directed to this two-tiered system.

29.     With respect to independent claim 1 of each of the Patents-in-Suit, a person of ordinary skill in the art would recognize that the implementation details of those claims require providing an advertisement with respect to each of the two tiers over a network.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶ 44.)  In other words, those claims require the selection of an advertisement based

---

evidence that B.E. intends to rely on in support of its allegations with respect to the understanding of one of ordinary skill in the art.

on information previously known about a user, *e.g.*, demographic information, and information concerning what a user is doing in real time.

30.     With respect to the first tier, claim 1 of each of the Patents-in-Suit requires providing a network-based advertisement based on information known about a user.  In particular, those claims each require receiving a request for an advertisement from a computer; selecting an advertisement based, in part, on a "unique identifier" which is used to track a computer user's information and sending the selected advertisement for display in response to the request.  For example, claim 1 of the '410 Patent requires "transferring a copy of software to a computer associated with the computer user … configured to … record computer usage information" as well as "determining a unique identified associated with the computer … [which] identifies information sent from the computer to the one or more servers," and "selecting an advertisement … based at least on the … information associated with the unique identifier."  (*See also* '411 Patent, claim 1; '440 Patent, claim 1.)

31.     A person of ordinary skill in the art would also recognize that additional implementation details with respect to the first claimed tier are also contained within the dependent claims of the Patents-in-Suit.  (*See, e.g.*, '410 Patent, claims 2 and 3 (using the "unique identifier" to "acquire demographic information" about a user and selecting an advertisement based on the acquired "demographic information"); '411 Patent, claims 2 and 3 (same); '440 Patent, claims 28 and 29 (requiring download of "scripting software" to "collect[] information concerning web site visitations" and "selecting" an advertisement based on that "collected information").)

32.     With respect to the second tier, claim 1 of the claims of the Patents-in-Suit require providing a network-based advertisement reactive to a user's real-time actions.  For example, claim 1 of the '410 Patent requires receiving a request for an advertisement from a computer "accessing"

a webpage; determining that "keywords" on the "displayed webpage" are associated with keywords stored at the server; selecting an advertisement based, in part, on the keywords contained on the "displayed webpage" and sending an advertisement for display in response to the request. In this way, the claim implementation details operate together to react to the user's actions in real-time. Further, a person of ordinary skill in the art would recognize that the step of "selecting an advertisement to be displayed on the computer . . . based at least on the one or more keywords" of the '410 Patent's claim 1, necessarily happens after the keyword matching step "determin[es] that one or more keywords . . . are associated with a displayed webpage." (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶ 19, n. 3.)

33.     Claim 1 of the '411 Patent and claim 1 of the '440 Patent contain the same general implementation details with respect to tier two. However, those claims require the tracking and selection based on "computer usage" and "information associated with the unique identifier," respectively, without specifying that such tracking and selection is based on keywords of a displayed webpage. (*See* '411 Patent, claim 1; '440 Patent, claim 1.) A person of ordinary skill in the art would understand that the selection steps with respect to these claims necessarily occur before an advertisement is provided "for display on the computer in response to [a] request."

34.     A person of ordinary skill in the art would also recognize that additional implementation details with respect to the second claimed tier are also contained in the dependent claims of the Patents-in-Suit. (*See*, *e.g.,* '410 Patent, claim 13 (recording "usage information," using "usage information" to identify a "behavior of the user," providing advertising based on the "identified behavior"); '411 Patent, claim 16 (same); '440 Patent, claim 8 (using a "keyword" associated with advertising material to provide "reactive targeting" of advertisements), Claims 25

and 27 (respectively requiring "providing reactive targeting of advertising" based on "user interaction with the computer" or "user's current interaction").)

**The Specification Teaches that the Claimed Inventions Are Directed to Solving Problems Unique to Network Based Advertising Systems**

35.     As detailed herein, a person of ordinary skill in the art would recognize that the Patents-in-Suit evidence that the claims are directed to network-based advertising systems and problems unique to network-based advertising systems.  (*See supra* ¶¶ 28–34 and *infra* ¶¶ 36–40; *see e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 28–40.)  Nothing in the Patents-in-Suit indicates that the claimed inventions are directed to solving a problem existing in real-world, non-network-based, advertising.

36.     For example, the Field of the Patents-in-Suit states that the "invention" relates to components for providing advertising over a computer network such as the Internet.  (*See*, e.g., '410 Patent, 1:24–32.)  Similarly, the Background of the Patents-in-Suit explains and distinguishes existing network-based advertising systems.  (*See*, *e.g.,* '410 Patent, 1:49–52 (explaining that "Pointcast™" uses "push technology"), 2:8–10 (discussing and distinguishing "common methods of advertising via the Internet" is the use of embedded links); 2:42–62 (discussing and distinguishing the "common way" systems for network-based advertising obtained demographic information); 2:63–3:46 (discussing and distinguishing individual references concerning network technology).)

37.     Further, one of ordinary skill in the art would recognize that the Detailed Description of the Invention contained in the Patents-in-Suit provides a description of a network-based advertising system that is inapplicable to traditional non-network-based advertising.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 28–43 (detailing teachings of the specification and technical manner in which problems of prior art are overcome).)  For example, Figure 3 of the Patents-in-Suit, along

with the accompanying description in the specification, would be understood by a person of ordinary skill in the art as a disclosure of technological improvements that enabled the claimed two-tiered reactive advertising system.  (*Id.* ¶¶ 33–35.)

38.     The Detailed Description of the Invention explains the relative advantages of real-time reactive advertising only in the context of network-based advertising:

> As will be appreciated by those skilled in the art, the reactive targeting provided by client software application 10 is handled in real time, rather than simply as a part of building a set of advertisements for later display to the user.  This permits the display of advertising that is relevant to what the user is doing at any particular time.  Thus, if the user is using the computer to search for information on stocks, then client software application 10 can detect this (whether by recognizing the web site being accessed, the keywords used in the web pages being accessed, the program being executed, or some other aspect of the user's search) and can display an advertisement that is relevant to this topic, whether it be for a stock brokerage, a stock exchange, an investment group, or some other organization.

('410 Patent, 20:24–37.)  As detailed below (*see infra* ¶¶ 39–46.), this feature of the Patents-in-Suit and the claims would not be understood to be analogous to traditional print advertising or an in-person sales transaction.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 28–40.)

**The Claimed Inventions Are Not Analogous to Abstract Concepts**

39.     The claimed invention would not have been understood by a person of ordinary skill in the art at the time of the invention as the automation of a previously manual process or the mere use of a computer as a tool to increase the speed and/or efficiency of a manual process.  The claimed inventions are not analogous to print-based advertising and print-based advertising would not have been considered analogous to a person of ordinary skill in the art during the relevant time.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 47–49.)  A person of ordinary skill in the art would recognize that in print-based advertising an advertiser knows at the time an advertisement is inserted into a newspaper, magazine, or other print-based media, that a reader will see the advertisement along with the content of the page on which the advertisement appears.  (*Id.* ¶ 48.)  As such, one of

ordinary skill in the art would know that real-time reactive advertising is inapplicable and indeed not possible in the context of print advertising. At best, print advertising could use group information to associate an advertisement with a group of individuals.

40.     In print-based advertising, the advertisement is permanently associated with the content and there is no ability to change the advertisement if a different user, with different interests, reads the newspaper or magazine. (*Id.*) The network-based advertising system provided by the claimed inventions provides advertisements in a way that simply could not be done in print advertising. Indeed, a person of ordinary skill in the art would find the claimed inventions seek to provide network-based advertisements where, prior to the claimed inventions, it was not conventionally known what a user was viewing in real time and reacting to that material. (*Id.*) This problem would be considered unique to the world of network-based advertisement. (*Id.*)

41.     The claimed inventions are not analogous to an in-person sales transaction and they would not have been considered analogous to such by a person of ordinary skill in the art during the relevant time. First, as a general matter, in-person sales transactions are unrelated to advertising in the context of the claimed inventions. In-person sales involve a two-way interaction where a salesperson can observe a customer and react thereto based on what they see and/or hear in an effort to close a transaction. In contrast, the claimed inventions are in the network-based advertising environment. In this environment, an advertiser seeks to educate the public about a product or service over a network. During the relevant time, a remote server had no ability to see and listen to either the public at large or a particular potential customer and respond.

42.     Advertising, in general, and network advertising, in particular, typically involves displaying advertisements with some other associated content. An in-person sales transaction would not be considered similar. In-person sales transactions during the relevant time did not

13

customarily involve selecting advertisements, associating advertisements with other content, determining information previously known about a user, or selecting advertisements based on information both previously known and unknown about a customer.

43.     Second, in an in-person sales transaction, a salesperson may consider a customer's observable characteristics and respond thereto.  Unlike an in-person sales transaction, at the time of Mr. Hoyle's inventions, conventional network-based advertising systems could not directly observe the user's behavior in real-time.  Indeed, there were no observation problems or communication problems with conventional in-person sales activities that Mr. Hoyle was attempting to automate.  Similarly, the claimed invention does not attempt to automate an in-person sales transaction by providing a type of video teleconferencing system which would allow a remote salesperson the ability to observe a customer remotely.  One of ordinary skill in the art would recognize that the claimed inventions' implementation details (discussed in detail below) (*see infra* ¶¶ 77–89) overcome the fact that conventional networking systems did not observe and could not react to a user's actions.

44.     A person of ordinary skill in the art would not understand the claims to be analogous to a system that tailored display information based on navigation data or the time of day.  One of ordinary skill in the art would recognize that information concerning navigation data and/or the time was readily observable by conventional computer systems in the late 1990s.  A person of ordinary skill in the art would recognize that the information required to be observed and reacted to in the claimed two-tiered real-time reactive advertising system was not observed, recorded, or reacted to by conventional computer systems.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 47–49.)

45.     Similarly, to the extent the claims were understood to be directed to providing real-time targeted advertising based on keywords contained on web pages visited by a user, that would

not be considered an abstract idea by one of ordinary skill in the art at the time.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 41–44.)  Instead, one of ordinary skill in the art would recognize that the comparison of keywords on a user's displayed webpage to keywords stored at a server are an unconventional implementation detail of claim 1 of the '410 Patent.  (*See, e.g., supra* ¶¶ 68–73; Ex. 4, Zatkovich Decl. ¶¶ 33–40, 44.)

46.    One of ordinary skill in the art would further recognize that the unconventional implementation detail requiring the use of keywords to determine what a user is doing in real time and reacting thereto reflects a particular manner to determine what a user is doing in real time. (*Id.*)  Thus, to the extent this particular implementation detail was considered by a person of ordinary skill in the art to be part of the general "idea" of the Patents-in-Suit, this implementation detail would render the claimed inventions directed to patentable subject matter.

**The Claims Are Directed to Solving Technical Problems Unique to the Network Advertising Context**

47.    One of ordinary skill in the art would understand that the claims of the Patents-in-Suit are directed to solving several problems in the network-based advertising context that did not exist in the traditional advertising context.  (*See infra* ¶¶ 48–59; Ex. 4, Zatkovich Decl. ¶¶ 19–44.)

48.    First, one of ordinary skill in the art would understand that the claimed inventions were directed to overcoming problems with existing browsers and scripting languages which could not provide the computer usage and profile information needed for two-tiered reactive advertising. (Ex. 4, Zatkovich Decl. ¶¶ 22–24, 28, 44.)  For example, conventional browsers of the time, such as Internet Explorer 4.0 and Netscape Navigator 4.0, operated very differently than the browsers of today.  As reflected in the Patents-in-Suit, in the late 1990s browsers were conventionally used for limited purposes, such as accessing information.  (*See* '410 Patent, 3:60–66.)  Further, conventional browsers were designed with strict information security protocols making

information within one browser window not observable to another browser window (*e.g.*, from one website to another website).  As reflected in the Patents-in-Suit, in the late 1990s transporting information out of a browser to another browser was not conventionally performed and would not have been a simple task to one of ordinary skill in the art.  (*See* '410 Patent, 3:66–67.)

49.     One of ordinary skill in the art would recognize that the observability problems caused by conventional browsers and scripting languages were overcome by the provision of software from a server to a user's computer configured to provide advertisements and track a user's activities.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 28–32.)  The downloadable software approach allowed for the server to observe computer usage information and select advertisements based on information recorded for purposes of each of the two tiers required by the claims.  (*Id.*)  Further, if a person of ordinary skill in the art were to consider the claims directed to providing real-time targeting advertising based on keywords contained on web pages visited by a user, such a person would recognize the use of keywords on a display screen to determine a computer's users' real-time actions and reaction thereto reflects a specific improvement directed at overcoming the limitations of conventional browsers.  (*Id.* ¶¶ 22–24, 28, 44.)

50.     The downloadable software approach is an element of claim 1, the only independent claim, of each of the Patents-in-Suit.  (*See, e.g.*, '410 Patent, claim 1 (transferring "software" to "run on the computer" and "display[s] advertising content and record computer usage information"); '411 Patent, claim 1 (same); '440 Patent, claim 1 (same).)  Implementation details with respect to the downloadable software approach are further reflected in the dependent claims of the '410 Patent and the '411 Patents.  (*See*, *e.g.*, '410 Patent, claim 8 (using "unique identifier" to identify "copy of the software"); '411 Patent, claim 9 (same); '440 Patent, claim 28 (requiring

downloadable "scripting software" to "collect information" on "website visitations"), claim 30 (requiring "scripting software" to be in JavaScript).)

51.     Second, conventional advertising systems during the relevant time were unable to track information regarding an individual's computer usage and react thereto.  In the late 1990s, conventional browser technology contained privacy limitations designed to limit and protect access to information associated with a website.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 22–23.)  For example, those conventional browsers did not provide access to information, *e.g.*, Document Object Model (DOM) information, which the Patents-in-Suit teach can be used to monitor and track information for the claimed two-tiered network advertising required by the claims.  (*Id.*)

52.     Further, conventional browsers could not gather, share, respond to or track information regarding the use of programs run on the computer.  Instead, like an information silo, conventional browsers only maintained information regarding the user's interaction with the browser itself.  This made even the transportation of information from one browser to another, which was not conventionally done at the time, difficult to a person of ordinary skill in the art. (*See* '410 Patent, 3:66–67.)

53.     One of ordinary skill in the art would understand that the claimed inventions were directed to overcoming problems with conventional systems which were unable to track information regarding a user's computer usage.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 22–28, 39–40, 44.)  One of ordinary skill in the art would recognize that this problem was overcome with a unique identifier used for associating and compiling a user's computer usage information (tracked locally using the claimed downloadable software).  (*Id.*)

54.     The use of a unique identifier for tracking and associating a user's computer usage is an element of claim 1 of each of the Patents-in-Suit.  (*See, e.g.,* '410 Patent, claim 1 (determining

a "unique identifier" for tracking of "information sent from the computer to one or more servers"));
'411 Patent, claim 1 (same); '440 Patent, claim 1 (same).)   Implementation details with respect to
tracking computer usage are also reflected in the dependent claims of the Patents-in-Suit.  (*See*,
e.g., '410 Patent, claim 13 (recording "usage information," using "usage information" to identify
a user's behavior, providing advertising based on the "identified behavior"); '411 Patent, claim 16
(same);  '440 Patent, Claims 25, 26, and 27 (require "providing reactive targeting of advertising"
based on "user interaction with computer" or "user's previous interaction with computer" or
"user's current interaction"), '440 Patent, claim 28 (requiring downloadable "scripting software"
to "collect information" on "website visitations"), claim 30 (requiring "scripting software" to be
in JavaScript).)

55.    Third, one of ordinary skill in the art would also understand that the claimed
inventions were directed to overcoming problems with the slow dialup speed of internet
connections.  In the late 1990s, conventional internet speeds made it exceedingly difficult to
determine the relevance of advertisements for a particular user in real time.  (*See, e.g.*, Ex. 4,
Zatkovich Decl. ¶¶ 33–35, 44.)  This was because reactionary real-time advertising was thought
to require transmission of significant amounts of information during the relevant time.  (*See, e.g.*,
*id.* ¶¶ 22–23, 44.)  A person of ordinary skill in the art would recognize that the Patents-in-Suit
teach a solution associated with processing advertisements using keywords.  (*See, e.g.*, *id.* ¶¶ 33–
35, 44.)

56.    In particular, the Patents-in-Suit teach storing keywords at the server and using
those words for comparison to the information concerning what a user is doing in real-time.  (*See,
e.g.*, *id.*)  One of ordinary skill in the art would recognize that by comparing keywords on a user's
displayed page with pre-associated keywords stored at a server, which was not possible for

18

conventional browsers in 1998, the limitations generally presented by slow dial-up speeds were overcome.  (*See, e.g.*, *id.*)  This elegant solution reduced required information sharing because constant monitoring of a user's activities using large amounts of information was not necessary.

57.     One of ordinary skill in the art would further recognize that the claimed inventions overcame the problem associated with the relatively slow speeds of conventional Internet connections by transmitting advertisements in periodic increments before they are to be displayed. (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 36–38.)  The provision of advertisements before they were needed at a user's terminal was unconventional and resulted in less information that needed to be transmitted in reaction to a computer user's action.  (*Id.*)

58.     The solution reflected by associating and comparing keywords from a displayed webpage with keywords stored at a server is a required element of claim 1 of the '410 Patent and claim 8 of the '440 Patent, along with the claims that depend thereon.  (*See, e.g.*, '410 Patent, claim 1 (requiring comparison of "keywords" "associated with a displayed webpage with the plurality of keywords being stored in a memory associated with the one or more servers".); '440 Patent, claim 8 (using a "keyword" associated with advertising material to provide "reactive targeting" of advertisements).)  The solution reflected by pre-association of advertisements and the transmission of advertisements to a user's computer before they are to be displayed is reflected in certain claims of the Patents-in-Suit.  (*See, e.g.*, '410 Patent, claim 6 ("periodically selecting and transferring additional advertising content to the computer . . ."); '411 Patent, claim 7 (same); '440 Patent, claim 10 ("sending a number of the advertisements to the computer using a digital network protocol").)

59.     For purposes of this Complaint, the claimed solutions to the technical problems have been associated with individual limitations, however a person of ordinary skill in the art

would recognize that particularized benefits are received when the claim limitations are considered collectively.  For example, as detailed above, the claim limitations collectively provide for the delivery of two-tiered reactive, real-time advertising which required overcoming, at least, each of the above-identified technical limitations of conventional networking systems.

60.     At least for the reasons stated above, a person of ordinary skill in the art would find the claims directed to solving a network-centric problem unique to the network-based advertising context.

**The Claimed Implementation Details Were Not Well-Understood, Routine or Conventional in the Late 1990s**

61.     The claims of the Patents-in-Suit, when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components.  Instead, as detailed below, a person of ordinary skill in the art would recognize that each claim of the Patents-in-Suit contains specific implementation details, *i.e.*, claim limitations, that were neither individually, nor collectively, well-understood, routine, or conventional at the time of the invention over twenty years ago.  To the extent a person of ordinary skill in the art overlooked the claim implementation details which provide technical solutions to technical problems unique to the network-based advertising context and believed the claims were directed to an abstract idea, such a person of ordinary skill in the art would recognize that the claim implementation details comprise an inventive concept and patent eligible subject matter.  (*See infra* ¶¶ 62–89.)

62.     The claimed technology (*e.g.*, providing network-based reactive, real-time two-tiered targeted advertising) and the technical features that allowed for the invention to be utilized was not known in the prior art at the time of the inventions, let alone well-understood, routine, or conventional.  As detailed below, the specific limitations of the claims ground the claims in the

inventive technological improvement by requiring specific implementation details, *e.g.*, a downloadable software approach for providing advertisements and tracking a user, a unique identifier for communication of a user's computer interactions and associating such information with a user, as well as the association of keywords contained on a displayed web page with keywords stored and used for advertisement retrieval.

63.     A first claimed implementation detail that would not be considered well-understood, routine, or conventional during the late 1990s was the provision of software from a server to a user's computer for the purpose of providing advertisements and tracking a user's activities including information regarding programs run on the user's computer.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 22–24, 28, 44.)   Unconventional implementation details directed to the providing of downloadable software with particular characteristics are required as limitations of each independent claim of the Patents-in-Suit.  (*See*, *e.g.,* '410 Patent, claim 1 (transferring "software" to "run on the computer" and "display[s] advertising content and record computer usage information" including information regarding "programs run" on the computer); '411 Patent, claim 1 (same); '440 Patent, claim 1 (same).)

64.     The dependent claims of the Patents-in-Suit contain additional implementation details directed to the software provided to the user's computer which was also not well-understood, routine, or conventional at the time of the claimed inventions.  (*See, e.g.*, '410 Patent, claim 8 (using "unique identifier" to identify "copy of the software"); '411 Patent, claim 9 (same); '440 Patent, claim 28 (requiring downloadable "scripting software" to "collect information" on "website visitations"), claim 30 (requiring "scripting software" of claim 28 to be in JavaScript); '440 Patent, claim 35 (requiring downloadable "scripting software" to acquire "demographic information" not provided by user), claim 37 (requiring "scripting software" of claim 35 to be in

JavaScript).)  At the time of the claimed inventions, the implementation details of the dependent claims directed to the use of "scripting software" to track computer usage information such that reactive advertisements could be provided was not only not conventional but also unknown.

65.    One of ordinary skill in the art would recognize that conventional software in the late 1990s did not operate to monitor and collect information regarding a computer user's activities and programs run on a computer.  (*See, e.g.*, Ex. 4, Zatkovich Decl. ¶ 28.)  One of ordinary skill in the art would recognize that a conventional manner of providing advertisements over a network was using links embedded within web pages or banner advertisements.  (*See, e.g.*, '410 Patent, 2:8–10.)  As a general matter client software was not used to gather information to select such advertisements.

66.    The Patents-in-Suit teach that the conventional way to acquire information for targeting advertising at the time of the Patents-in-Suit was with HTML forms that were filled out by a computer user.  (*See id.* at 2:42–51.)  This conventional manner of acquiring data would not be understood as a disclosure of the downloadable software approach because no downloadable software is utilized to either provide advertisements or collect information regarding programs run on the user's computer.

67.    One of ordinary skill in the art would not interpret any statements, either individually or collectively, in the Patents-in-Suit as an admission that the claimed implementation details with respect to the downloadable software approach are conventional.  In particular, as detailed below (*see infra* ¶¶ 77–89), a person of ordinary skill in the art would not find the Patents-in-Suits' statements regarding prior art references to reflect a concession that any claimed implementation details related to the downloadable software approach including its ability to track

22

a user's "utilization" of a computer and "programs run on a computer," was known, let alone routine, well-understood or conventional.

68.     A second claimed implementation detail that would not have been considered well-understood, routine, or conventional during the late 1990s is the provision of reactive advertising such as through a comparison of keywords on a website displayed on a user's screen with keywords stored at the user's computer.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 28–32, 36–38, 44–45.)

69.     Unconventional implementation details directed to the providing of reactive advertisements are required as limitations of each independent claim of the Patents-in-Suit.  In particular, the unconventional claim implementation details that operate to provide reactive advertising in claim 1 of the '410 Patent include claim limitations directed to receiving a request for an advertisement from a computer "accessing" a webpage; comparing keywords on the "displayed webpage" with keywords stored at the server; selecting an advertisement based, in part, on the keywords on the "displayed webpage" and sending an advertisement for display in response to the request.   (*See generally,* '410 Patent, claim 1.)

70.     Claim 1 of the '411 Patent and claim 1 of the '440 Patent contain similar general unconventional implementation details with respect to the providing of reactive advertising as claim 1 of the '410 Patent.  (*See generally,* '411 Patent, claim 1; '440 Patent, claim 1.)  However, those claims require the tracking and selection based on "computer usage" and "information associated with the unique identifier," respectively, without specifying that such tracking and selection is based on keywords of a displayed webpage.  (*Id.*)

71.     The reactive association and comparison between keywords from a displayed webpage with keywords stored at a server is a required element of claim 1 of the '410 Patent and claim 8 of the '440 Patent, along with the claims that depend thereon.  (*See*, *e.g.*, '410 Patent, claim

1 (requiring comparison of "keywords" "associated with a displayed webpage with the plurality of keywords being stored in a memory associated with the one or more servers"); '440 Patent, claim 8 (using a "keyword" associated with advertising material to provide "reactive targeting" of advertisements).) Further, in addition to the above identified claim implementation details, a person of ordinary skill in the art would recognize that the dependent claims contain implementation details that were not well-understood, routine, or conventional at the time of the invention. (*See*, *e.g.,* '410 Patent, claim 13 (recording "usage information," using "usage information" to identify a user's behavior, providing advertising based on the "identified behavior"); '411 Patent, claim 16 (same); '440 Patent, claim 8 (using a "keyword" associated with advertising material to provide "reactive targeting" of advertisements), Claims 25, 26, and 27 (require "providing reactive targeting of advertising" based on "user interaction with computer" or "user's previous interaction with computer" or "user's current interaction").)

72. One of ordinary skill in the art would recognize that conventional advertising systems in the late 1990s did not operate to collect information regarding displayed website information and reactively provide advertising in response. (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 28–32, 44.) Further, neither the identification of keywords on a displayed webpage for the purpose of comparison to keywords stored on a server, nor the selection of advertisements in response to such information, was well-understood, routine, or conventional at the time of the inventions in the late 1990s. The Patents-in-Suit fail to state, suggest, or imply that these additional claimed implementation details related to reactive advertising were known, let alone routine, well-understood or conventional at that time. Instead, the Patents-in-Suit distinguish prior art that was incapable of providing real-time reactive advertising based on a user's actions. (*See*, *e.g.*, '410 Patent, 3:43–46.)

73.     One of ordinary skill in the art would not interpret any statements, either individually or collectively, in the Patents-in-Suit as an admission that the claimed implementation details with respect to the use of keywords were known, let alone routine, well-understood, or conventional at the time of the inventions.  As detailed more particularly below (*see infra* ¶¶ 77–89), a person of ordinary skill in the art would recognize that the specification does not describe any prior art system as providing real-time reactive advertising, generally, let alone through a comparison of keywords on a displayed webpage with keywords stored at a server.

74.     Third and fourth claimed implementation details that were not well-understood, routine, or conventional during the late 1990s are the use of a unique identifier to track information sent from a computer and the selection of an advertisement based on the information associated with a unique identifier.  (*See, e.g.*, Ex. 4, Zatkovich Decl. ¶¶ 25–28, 44.)  At the time of the claimed inventions there were limited means of gathering information from a user.  (*Id.*)  For example, at the time of the claimed inventions a cookie could be used to track certain page access information with respect to a single website.  That information could include, for example, the pages an individual may have visited only on that particular website.  Conventionally cookies were not utilized by other websites.

75.     The use of a unique identifier to both track information regarding a computer's usage sent to a server and to select an advertisement is a required implementation detail of each independent claim of the Patents-in-Suit.  (*See, e.g.*, '410 Patent, claim 1 (determining a "unique identifier" for tracking of "information sent from the computer to one or more servers"); '411 Patent, claim 1 (same); '440 Patent, claim 1 (same).)  Further, a person of ordinary skill in the art would recognize that additional implementation details with respect to tracking computer usage information and providing advertisements in response thereto are also reflected in the dependent

claims of the Patents-in-Suit.  (*See*, *e.g.*, '410 Patent, claim 13 (recording "usage information," using "usage information" to identify a user's behavior, providing advertising based on the "identified behavior"); '411 Patent, claim 16 (same); '440 Patent, Claims 25, 26, and 27 (require "providing reactive targeting of advertising" based on "user interaction with computer" or "user's previous interaction with computer" or "user's current interaction"), '440 Patent, claim 28 (requiring downloadable "scripting software" to "collect information" on "website visitations"), claim 30 (requiring "scripting software" of claim 28 to be in JavaScript); '440 Patent, claim 35 (requiring downloadable "scripting software" to acquire "demographic information" not provided by user), claim 37 (requiring "scripting software" of claim 35 to be in JavaScript).)

76.     One of ordinary skill in the art would not interpret any of the Patents-in-Suit's statements to reflect an admission that the claimed implementation details with respect to the use of a unique identifier to track information sent from a user's computer and the selection of an advertisement based on the unique identifier were routine, well-understood, or conventional at the time of the inventions.  As detailed more particular below (*see infra* ¶¶ 77–89), the Patents-in-Suit do not describe the use of unique identifiers in the prior art for any purpose let alone for the purpose of tracking information from a user's computer and providing reactive advertisements in response thereto.

### The Specification Does Not Admit that The Claim Implementation Details Were Well-Understood, Routine or Conventional in the Late 1990s

77.     One of ordinary skill in the art would not understand the Patents-in-Suit's statements regarding the state of network-based advertising technology at the time of the inventions, including the individual prior art references discussed in the specification, to reflect an admission that the claimed implementation details were routine, well-understood or conventional prior to the inventions.  Consistently, the inventor of the Patents-in-Suit did not intend any of the

statements to mean that any of the above-identified implementation details were well-understood, routine, or conventional.  One of ordinary skill in the art would have understood the statements of the Patents-in-Suit consistently with the inventor's intentions.

78.   For example, the Patents-in-Suit distinguish U.S. Patent Number 5,724,521 to Dedrick (the "Dedrick Patent").  The Dedrick Patent is described as containing a metering server to provide advertisements and charge the advertiser.  (*See*, *e.g.,* '410 Patent, 2:65–3:11.) The Patents-in-Suit state that the Dedrick Patent's system contained a "metering server" and could include client-side software to acquire and compile one thing: "information concerning the user's interaction with the advertising or other content ***provided by the metering server***."  (*See*, *e.g.,* '410 Patent, 3:8–11 (emphasis added).)

79.   A person of ordinary skill in the art reading the Patents-in-Suit's statements regarding the Dedrick Patent would not find those statements inconsistent with such person's understanding that the identified claim implementation details were not well-understood, routine, or conventional at the time of the Patents-in-Suit's claimed inventions.   A person of ordinary skill in the art would not understand the Patents-in-Suits' statements regarding the Dedrick Patent to be a concession that the claimed downloadable software implementation detail discussed above was known, let alone conventional.   The claimed downloadable software implementation detail requires tracking information regarding the programs run on a user's computer.  (*See supra* at ¶¶ 63–67.)  The Dedrick Patent is described as containing a "metering server" that tracks a user's interaction with information provided by that "metering server."  (*See*, *e.g.*, '410 Patent, 3:8–11.) The Patents-in-Suit say nothing about whether the Dedrick Patent uses client-side software to track a computer's usage of programs run on the computer.  Further, the Patents-in-Suit do not state that the Dedrick Patent operated in a routine, well-understood, or conventional manner.

80.     The Patents-in-Suit also distinguish U.S. Patent Number 5,732,218 to Bland et al. (the "Bland Patent").  The Bland Patent is described as a system for gathering data regarding "information resources" and "reporting back to the servers that contain the information resources." (*See*, *e.g.*, '410 Patent, 3:11–31.)  A person of ordinary skill in the art reading the Patents-in-Suit's statements regarding the Bland Patent would not find those statements inconsistent with such person's understanding that the four identified claim implementation details were not well-understood, routine, or conventional at the time of the Patents-in-Suit's claimed inventions.

81.     A person of ordinary skill in the art would not understand the Patents-in-Suits' statements regarding the Bland Patent to evidence that the claimed downloadable software implementation details discussed above were known, let alone routine, well-understood or conventional at the time of the inventions.  (*See supra* ¶¶ 63–67.)  For example, the claimed downloadable software implementation details require tracking information regarding the programs run on a user's computer.  (*See supra* at ¶¶ 63–64.)  None of the claimed implementation details concern reporting to servers containing "information resources" information regarding a user's interaction with such "information resources."

82.     A person of ordinary skill in the art would not understand the Patents-in-Suits' statements regarding the Bland Patent as a concession that the claimed implementation details were known, let alone routine, well-understood or conventional at the time of the inventions.  The Patents-in-Suit say nothing about whether the Bland Patent uses client-side software to track a computer's usage of programs run on the computer.  Further, the Patents-in-Suit do not state that the Bland Patent operated in a routine, well-understood, or conventional manner.

83.     The Patents-in-Suit also distinguish U.S. Patent Number 5,347,632 to Filepp *et al.* (the "Filepp Patent").  The Filepp Patent is described as containing "a reception system" in which

"user demographics" and "individual system usage" information are used to provide "targeting advertisements." (*See*, *e.g.*, '410 Patent, 3:37–46.) A person of ordinary skill in the art reading the Patents-in-Suit's description of the Filepp Patent would not find such description inconsistent with such person's understanding that claim implementation details identified herein were not routine, well-understood or conventional at the time of the Patents-in-Suit's claimed inventions.

84.     A person of ordinary skill in the art would not understand the Patents-in-Suits' statements regarding the Filepp Patent as a concession that the claimed implementation details were known, let alone routine, well-understood or conventional at the time of the inventions. The Patents-in-Suit do not state that the Filepp Patent used a downloadable software at all. (*Id.*) Second, the Patents-in-Suit do not state that the Filepp Patent provided real-time reactive advertising at all let alone through a comparison of keywords on a website displayed on a user's screen with keywords stored at the user's computer. (*See, e.g.*, *id.*, 3:43–46.) Third and fourth, the Patents-in-Suit do not state that the Filepp Patent used unique identifiers at all, let alone, that they were used for the purpose of tracking information sent from a computer or selecting an advertisement. Further, the Patents-in-Suit do not state that the Filepp Patent operated in a routine, well-understood, or conventional manner.

85.     The definitions provided in the Patents-in-Suit, (*see*, *e.g.*, '410 Patent, 4:1–5:6.), would not be understood to reflect the conventional nature of any of the particular claimed implementation details identified above. Instead, the definitions reflect the definitions that a person of ordinary skill in the art should use to understand the claimed inventions.

86.     The specification's definitions, (*see*, *e.g.*, '410 Patent, 4:1–5:6.), do not state that any of the above identified claimed implementation details were known, let alone routine, well-

understood or conventional at the time of the inventions.  Instead, the definitions do not mention the claimed implementation details of either the independent or dependent claims identified above.

87.     One of ordinary skill in the art would not believe the claims are directed to routine or conventional implementation details based on their use of the defined terms "server" and "computer."  Rather, if the claimed computers and servers are considered in conjunction with the additional implementation details required by the claims, they become unconventional servers and unconventional computers.  One of ordinary skill in the art would recognize that the claimed servers and user computers are unconventional precisely because they must operate as required by the unconventional implementation details of the claims discussed above.  (*See, e.g.,* Ex. 4, Zatkovich Decl. ¶¶ 44–46.)

88.     A person of ordinary skill in the art would find that the above identified claimed implementation details collectively were not routine, well-understood or conventional at the time of the inventions.  As detailed above, the claim implementation details individually would be unconventional in the late 1990s.  (*See supra* ¶¶ 61–87.)  Further, one of ordinary skill in the art would recognize that the claimed implementation details, when considered collectively, permit the collection of information regarding a user's real-time computer usage which was not conventionally collected, the collection and association of profile information, which was not traditionally collected, and the real-time reactive response to such information, which also was not conventional.  (*See supra* ¶¶ 61–87; Ex. 4, Zatkovich Decl. ¶¶ 44–45 (evidencing claim limitations are individually and collectively unconventional).)  The specification contains no statements that would be interpreted by a person of ordinary skill in the art as an admission that the claimed implementation details when considered collectively were known, let alone routine, well-understood or conventional at the time of the invention.  (*See supra* ¶¶ 77–87.)  When considered

collectively, a person of ordinary skill in the art would find that the above identified implementation details result in the departure from what was routine, well-understood and conventional with respect to the collection of user information and the selection of a reactive, real-time advertisement in response to such information. (*See supra* ¶¶ 61–87; Ex. 4, Zatkovich Decl. ¶¶ 44–45.)

89.     A person of ordinary skill in the art would not understand the Patents-in-Suit to pre-empt other ways to solve the technical problems associated with providing reactive two-tiered advertisements in the late 1990s. In particular, a person of ordinary skill in the art would recognize that the problems related to: 1) the conventional internet speed of the late 1990s; 2) the inability of conventional browsers and scripting languages to track computer user information; and/or 3) the inability of conventional browsers and scripting languages to react to a user's actions were all eventually overcome using techniques unrelated to the claimed inventions. (*See supra* ¶¶ 35–38, 47–60.)

### The Claimed Inventions Are Directed to Patentable Subject Matter

90.     The claims of the Patents-in-Suit would not be understood by a person of ordinary skill in the art to be directed to an abstract idea. (*See supra* ¶¶ 27–38.) Instead, a person of ordinary skill in the art would recognize that the claims are directed to specific implementations of network based two-tiered targeted advertising methods. (*See supra* ¶¶ 35–38, 47–60.) The claimed inventions overcame technical problems unique to the field of network-based advertising using the claimed two-tiered network-based reactive advertising method. (*See supra* ¶¶ 35–38, 47–60.) The claimed systems were directed to and overcame problems that did not exist in an in-person sales transactions (where there were no problems observing customers) (*see supra* ¶¶ 43–46) with a solution that is inapplicable in the traditional advertising context (*see supra* ¶¶ 3 9–42). The

particular claim limitations or implementation details associated with the claimed two-tiered method (both individually and collectively) would not have been considered well-understood, routine, or conventional at the time of the invention over twenty years ago, (*see supra* ¶¶ 61–76), and the Patents-in-Suit would not be understood by a person of ordinary skill in the art to contain statements to the contrary *(see supra* ¶¶ 77–89).

91.     For the reasons stated herein, one of ordinary skill in the art would recognize that the claimed inventions were directed to patent eligible subject matter both at the time of the alleged inventions and today.

## COUNT I
## (INFRINGEMENT OF THE '410 PATENT)

92.     B.E. repeats and re-alleges the allegations of Paragraphs 1–91 above as if fully set forth herein.

93.     On information and belief, at least Google's AdWords has directly infringed at least claim 1 of the '410 Patent, either literally or under the doctrine of equivalents, by using a method of providing advertising based on the keywords in a webpage.

94.     As just one non-limiting example, Google infringes claim 1 of the '410 Patent through the performance of each step of that method claim.  For example, Google permits a computer user to access one or more servers via a network as part of Google's Ad Manager.  *See, e.g.*, https://support.google.com/admanager/answer/1143651.  Google transfers a copy of software to a computer associated with the computer user, the software being configured to run on the computer to display advertising content and record computer usage information associated with utilization of the computer when a user's web browser or mobile device loads a Google Ad Manager ad tag or Ad Manager ad code, triggering an ad request which passes information to the ad server, *see, e.g.* https://support.google.com/admanager/answer/1143651, and cookies, which

are transmitted during the ad request, are used to record usage information., *see, e.g.,* https://support.google.com/admanager/answer/1143651https://support.google.com/admanager/answer/1143651.  The computer usage information includes data regarding one or more programs run on the computer when information associated with the browser or mobile app is recorded, *see, e.g.,*                                         https://support.google.com/admanager/answer/2839090?hl=en; https://policies.google.com/technologies/cookies.    Google then determines a unique identifier associated with the computer, wherein the identifier uniquely identifies information sent from the computer to Google's servers when information, including a cookie, about the user and the device is   passed   within   the   request   to   Google's   Ad   Manager.   *See, e.g.,* https://support.google.com/admanager/answer/1143651; https://support.google.com/admanager/answer/2839090?hl=en.   Google determines that one or more keywords of a plurality of keywords are associated with a displayed webpage with the plurality of keywords being stored in a memory associated with Google's servers through the use of ad tags on a web page which are matched to defined key-values (keywords).  *See, e.g.,* https://support.google.com/admanager/answer/1143651; https://support.google.com/admanager/answer/188092?hl=en.  Google selects an advertisement to be displayed on the computer, the selection based at least on the one or more keywords together with information associated with the unique identifier identifying the computer when it transmits the custom targeting criteria using Google Ad Manager ad tags in an ad request and when Google's ad servers select an ad to serve to a user based on information Google's servers obtain.  *See, e.g.,* https://support.google.com/admanager/answer/1143651.  The information obtained by Google's server includes information, *e.g.*, a cookie, that serves as a unique identifier.  *See, e.g.,* https://support.google.com/admanager/answer/1143651.  Google then receives a request for an

advertisement from the computer accessing the web page and provides the selected advertisement for display on the computer in response to the received request when an ad request passes information to Google's ad servers and the ad is served to the user based on the received request. *See, e.g.,* https://support.google.com/admanager/answer/1143651

95.     As a result of Google's unlawful infringement of the '410 Patent, B.E. has suffered damage.  B.E. is entitled to recover from Google the damages adequate to compensate for such infringement, which have yet to be determined.

<strong>COUNT II<br>(INFRINGEMENT OF THE '411 PATENT)</strong>

96.     B.E. repeats and re-alleges the allegations of Paragraphs 1–95 above as if fully set forth herein.

97.     On information and belief, at least Google's AdWords has directly infringed at least claim 1 of the '411 Patent, either literally or under the doctrine of equivalents, by using a method of providing advertising based on the keywords in a webpage.

98.     As just one non-limiting example, Google infringes claim 1 of the '411 Patent through the performance of each step of that method claim.  For example, Google permits a user to access one or more servers via a network as part of a Google Display Network.  *See, e.g.,* https://support.google.com/google-ads/answer/2404190?hl=en&ref_topic=3121944.     Google transfers a copy of software to a computer associated with the computer user when Google's server transfers Gmail software, such as the Gmail app, when a user is using a mobile device app, and/or a  web  browser,  when  the  user  is  accessing  Gmail  via  a  browser.   *See,  e.g.,* https://support.google.com/google-ads/answer/2404190?hl=en&ref_topic=3121944. Google Ads optimizes the ads to make sure the ads display properly wherever the user views the ad and therefore Google's software is configured to run on the computer to display advertising content

and record computer usage information associated with utilization of the computer.  *See, e.g.,* https://support.google.com/google-ads/answer/7019460?hl=en.   Google's Gmail has messaging capabities which shows that Google's software is configured to allow user messaging capabilities between the user and one or more users.  *See, e.g.,* https://safety.google/privacy/ads-and-data/.  A cookie saved by Gmail/browser software is used for recording computer usage and the other information saved includes at least a unique identifier which allows Gmail/browser software to run on the computer such that one of a number of unique identifiers is recorded by the software. *See, e.g.,* https://support.google.com/google-ads/answer/2407785?hl=en.   Google determines a unique identifier associated with the computer, wherein the identifier uniquely identifies information sent from the computer to the one or more servers using a "NID" number. https://policies.google.com/technologies/types.   The "NID" number, *e.g.*, a cookie, contains a unique ID Google uses to track information regarding a user including a user's preferences and usage and thus determines the computer usage of the computer.   *See, e.g.,* https://policies.google.com/technologies/types.    Google retrieves information from a user demographic database associated with the computer user when the Gmail software configures the computer device to allow for messaging between users such as through Google messaging.  *See, e.g.,* https://support.google.com/google-ads/answer/2580383?hl=en.  Google stores the retrieved information in memory associated with Google's servers when the information provided by the user settings, websites visited, etc., is stored in a Google database.   *See, e.g.,* https://support.google.com/google-ads/answer/2580383?hl=en.  The retrieved/logged information may be a web request, an IP address, a browser type, etc., that is associated with a user.  *See, e.g.,* https://policies.google.com/technologies/ads?hl=en-US.   Google selects an advertisement to be displayed        on        the        computer,     *see,      e.g.,*        https://support.google.com/google-

ads/answer/7019460?hl=en, and Google matches the ads based on demographics and uses cookies in its ad selection, such as a "NID," and thus the selection is based at least on the usage of the computer together with information associated with the unique identifier identifying the computer, *see, e.g.,* https://support.google.com/google-ads/answer/1704368?hl=en; https://policies.google.com/technologies/ads; https://policies.google.com/technologies/types. The Google server receives a request for an advertisement from the computer accessing the web page and it matches the ads, using cookies based on a unique identifier in order to select the ad, and provides the selected advertisement for display on the computer in response to the received request when the ad is displayed based on the received request. *See, e.g.,* https://policies.google.com/technologies/ads.

99.     As a result of Google's unlawful infringement of the '411 Patent, B.E. has suffered damage. B.E. is entitled to recover from Google the damages adequate to compensate for such infringement, which have yet to be determined.

## COUNT III
## (INFRINGEMENT OF THE '440 PATENT)

100.     B.E. repeats and re-alleges the allegations of Paragraphs 1–99 above as if fully set forth herein.

101.     On information and belief, at least Google's AdWords has directly infringed at least claim 1 of the '440 Patent, either literally or under the doctrine of equivalents, by using a method of providing advertising based on the keywords in a webpage.

102.     As just one non-limiting example, Google infringes claim 1 of the '440 Patent through the performance of each step of that method claim. For example, Google permits a computer user to access one or more servers via a network as part of Google's Ad Manager. *See, e.g.,* https://support.google.com/admanager/answer/1143651. Google transfers a copy of software

to a computer associated with the computer user, the software being configured to run on the computer to display advertising content and record computer usage information associated with utilization of the computer when a user's web browser or mobile device loads a Google Ad Manager ad tag or Ad Manager ad code, triggering an ad request which passes information to the ad server, *see, e.g.* https://support.google.com/admanager/answer/1143651, and cookies, which are transmitted during the ad request, are used to record usage information., *see, e.g.,* https://support.google.com/admanager/answer/1143651https://support.google.com/admanager/answer/1143651.  The computer usage information includes data regarding one or more programs run on the computer when information associated with the browser or mobile app is recorded, *see, e.g.,* https://support.google.com/admanager/answer/2839090?hl=en; https://policies.google.com/technologies/cookies.  Google then determines a unique identifier associated with the computer, wherein the identifier uniquely identifies information sent from the computer to Google's servers when information, including a cookie, about the user and the device is passed within the request to Google's Ad Manager.  *See, e.g.,* https://support.google.com/admanager/answer/1143651; https://support.google.com/admanager/answer/2839090?hl=en.  Google selects an advertisement to be displayed on the computer, the selection based at least on the one or more keywords together with information associated with the unique identifier identifying the computer when it transmits the custom targeting criteria set by the publisher in the Google Ad Manager ad tags in the ad request and when Google's ad servers select an ad to serve to a user based on information the servers obtain.  *See, e.g.,* https://support.google.com/admanager/answer/1143651.  That information contains a cookie that serves as a unique identifier.  *See, e.g.,* https://support.google.com/admanager/answer/1143651.  Google then receives a request for an

advertisement from the computer accessing the web page and provides the selected advertisement for display on the computer in response to the received request when an ad request passes information to Google's ad servers and the ad is served to the user based on the received request. *See, e.g.,* https://support.google.com/admanager/answer/1143651..

103.    As a result of Google's unlawful infringement of the '440 Patent, B.E. has suffered damage.  B.E. is entitled to recover from Google the damages adequate to compensate for such infringement, which have yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, B.E. respectfully requests that this Court enter judgment in its favor as follows:

a.      holding that Google has directly infringed literally and/or under the doctrine of equivalents, one or more claims of the '410 Patent, the '411 Patent, and the '440 Patent;

b.      holding that B.E. is entitled to pre-suit damages consistent with, *e.g.*, 35 U.S.C. § 287;

c.      awarding B.E. the damages to which it is entitled under 35 U.S.C. § 284 for Google's past infringement, including a reasonable royalty;

d.      awarding B.E. costs and expenses in this action;

e.      awarding B.E. pre- and post-judgment interest on its damages; and

f.      awarding B.E. such other and further relief in law or in equity as this Court deems just and proper.

## JURY DEMAND

B.E., under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any and all issues so triable by right.

Dated:  February 11, 2021

OF COUNSEL:

Mark Raskin
Robert Whitman
KING & WOOD MALLESONS LLP
500 5th Avenue, 50th Floor
New York, New York 10110
(212) 319-4755
mark.raskin@us.kwm.com
robert.whitman@us.kwm.com

BAYARD, P.A.

/s/ Stephen B. Brauerman
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

*Attorneys for Plaintiff*
*B.E. Technology, L.L.C.*